[Cite as *State v. Debardeleben*, 2020-Ohio-661.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                                  No. 108277

    v. :

TARIQ M. DEBARDELEBEN, :

    Defendant-Appellant. :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 27, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-621002-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Anna M. Faraglia, and Andrew J. Santoli, Assistant Prosecuting Attorneys, *for appellee.*

Robey & Robey, and Gregory Scott Robey, *for appellant.*

ANITA LASTER MAYS, J.:

{¶ 1} Defendant-appellant Tariq M. Debardeleben ("Debardeleben") appeals his jury trial convictions for multiple felonies arising from the death of 15-month-old Morgan Dillard ("M. Dillard"). Debardeleben received a prison sentence of 15 years to life. We affirm.

## I.  Background and Facts

{¶ 2}  Nineteen-year-old Debardeleben resided in an apartment with his girlfriend of several years, Aleia Beard ("Beard"), and cousins Romell Carey ("Romell") and Reginald Carey ("Reginald").  Debardeleben was employed and had no criminal record.

{¶ 3}  Debardeleben and Beard often babysat at their apartment for the children of friends and family members.  M. Dillard spent the weekend with them several times previously without incident.  On Friday, August 25, 2017, M. Dillard's great aunt Cheryl Dillard ("C. Dillard") and cousin Robert Conway, Jr. ("Conway") babysat for M. Dillard during the day and testified that M. Dillard was in good spirits and health and did not fall or have bruises or bumps.  Great grandmother Victoria Dillard ("V. Dillard") and Shamika Howard ("Howard"), M. Dillard's paternal grandmother, took M. Dillard to a football game that evening and dropped her off at the apartment with Debardeleben and Beard about 10:30 p.m. to spend the weekend.  Debardeleben and Beard were babysitting for several nieces and nephews ranging in age from one to six years old when M. Dillard arrived.

{¶ 4}  V. Dillard and Howard testified that M. Dillard was happy and healthy that day.  Beard stated that M. Dillard, who was usually happy and playful, was coughing, whining, and not feeling well.

{¶ 5}  Beard and the children awakened about 7:00 a.m. the next morning.  M. Dillard was still coughing and irritable, but Beard did not observe any marks or bruises on M. Dillard's body.  Beard left for work about 8:00 a.m. while the children

remained with Debardeleben.  At approximately 9:50 a.m., Debardeleben called Beard and told her that he was going to call the police because M. Dillard passed out while he was dressing her after her bath.  Beard met the family at the hospital.  M. Dillard had blood around her mouth and was on life support.

{¶ 6} Warrensville Heights police officers Thomas Schanz ("Officer Schanz") and Terrence Sullivan ("Officer Sullivan") responded to the EMS request for assistance with a suspected child drowning.  Debardeleben told Officer Schanz and Officer Sullivan that he was bathing M. Dillard and left her alone in the bathtub for a few minutes to see why the other children were yelling and screaming.  M. Dillard was still sitting in the tub when he returned.  Debardeleben was drying and dressing M. Dillard when her body became limp.

{¶ 7} Debardeleben threw water on M. Dillard, called her name, and attempted to administer mouth-to-mouth resuscitation. He also called to cousins Romell and Reginald for assistance. Reginald, a nursing assistant, attempted resuscitation while Debardeleben called 911.

{¶ 8} Statements were taken from Debardeleben, Romell, and Reginald and police were given permission to look around the apartment and take photographs.  Some of the photographs depicted feces on the edge of the bathtub and in the bath water.  Debardeleben, Romell, and Reginald were arrested at the apartment.  M. Dillard was placed on life support upon arrival at the hospital and was pronounced dead later that morning.

{¶ 9} The coroner determined that that M. Dillard's death was a homicide caused by blunt impact injuries and bleeding. On September 21, 2017, Debardeleben was indicted for:

Count 1 — Aggravated murder, R.C. 2903.01; Count 2, murder, R.C. 2903.02(B) (caused the death by committing or attempting to commit the crime of felonious assault);

Count 3 — Murder, R.C. 2903.02(B) (caused the death by committing or attempting to commit the crime of endangering children);

Count 4 — Felonious assault, R.C. 2903.11(A)(1);

Count 5 — Endangering children, R.C. 2919.22(B)(1);

Count 6 — Endangering children, R.C. 2919.22(B)(2); and

Count 7 — Endangering children, R.C. 2919.22(A).

{¶ 10} Debardeleben pleaded not guilty and his jury trial began on February 5, 2019. At the close of the evidence, Count 1 was amended to murder under R.C. 2903.02(A) at the state's request due to the lack of evidence supporting prior calculation and design. On February 15, 2019, the jury entered a verdict of guilty on all counts as charged, except that the Count 1 conviction was for the lesser included offense of reckless homicide under R.C. 2903.041.

{¶ 11} The parties agreed that all counts merged as allied offenses of similar import. The state elected to proceed with sentencing on Count 2 — murder, R.C. 2903.02(B) with the felonious assault as the predicate offense. The defense agreed. Debardeleben received the statutory sentence of 15-years-to-life in prison with jail-time credit for 537 days.

{¶ 12} Appellant appeals.

## II. Assignments of Error

{¶ 13} Debardeleben presents four assigned errors for our review.

I. The trial court abused its discretion when it failed to declare a mistrial.

II. The state failed to present sufficient evidence to sustain the convictions.

III. Appellant's convictions are against the manifest weight of the evidence present and must be reversed.

IV. Appellant was denied due process of law and a fair trial by the cumulative errors committed by the trial court

## III. Discussion

### A. Mistrial

{¶ 14} We have previously held

[g]ranting a mistrial is an extraordinary remedy for an error. *State v. Ramo*s, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 36. Consequently, a mistrial should not be ordered simply because some error has intervened. The error must prejudicially affect the merits of the case and the substantial rights of one or both of the parties. *Tingue v. State*, 90 Ohio St. 368, 108 N.E. 222 (1914), syllabus. Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

*State v. Williams*, 8th Dist. Cuyahoga No. 106266, 2018-Ohio-3368, ¶ 34.

{¶ 15} In addition,

[t]his court reviews a denial of a motion for mistrial under an abuse of discretion standard. *State v. Treesh*, 90 Ohio St.3d 460, 480, 2001-Ohio-4, 739 N.E.2d 749 (2001). An abuse of discretion connotes more than an error of law or judgment; it implies the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Thus, this court will

only reverse the trial court's denial of Williams's request for a mistrial if it finds the trial court's decision to deny the request unreasonable, arbitrary, or unconscionable.

*Id.* at ¶ 35.

### 1. Emotional Outburst

{¶ 16} Debardeleben argues that the jury was prejudiced by outbursts made by spectators who threatened Debardeleben and his family during the February 7, 2019 court proceedings and the trial court's dismissal of the jury for the day without issuing a curative instruction. Debardeleben admits that the trial court issued an instruction the next day. He also argues that the trial court's failure to grant a mistrial after being advised of threats to his mother also deprived him of due process and a fair trial. (Tr. 1085 and 1094.)

{¶ 17} The disruption occurred after photographs of the apartment scene and the decedent were introduced. Shortly after the disruption, defense counsel advised the trial court that questioning of the current witness would exceed the trial court's 4:30 p.m. dismissal time. The trial court dismissed the jury and had the witness step down. The trial court then sternly addressed the spectators:

> Court: They're not allowed back in the courtroom. The folks that just had that outburst, that just threatened the defendant in this case, are not allowed back in this courtroom. One more outburst and no one is going to be allowed in.
>
> Is that understood?
>
> Can you please relay that message?
>
> I need an affirmative answer.
>
> Spectators: Yes.

Court: I'm talking to you all in the back.

Spectators: Yes.

Court: Any outbursts again no one is going to be allowed in the courtroom.

Is that understood?

Spectators: Yes.

Court: The gentlemen that were here before, that were behaved all day, are not allowed back in this courtroom.

Is that understood?

Spectators: Yes.

(Tr. 979-980.) The prosecutor also stated that he had advised the spectators that they were not to return as they were being removed.

{¶ 18} Immediately after the jury was seated the next morning, the trial court advised:

I'm going to give you an instruction. Like I told you, every once in a while you may get an instruction from me during the trial.

As you were processing out of the courtroom yesterday, there was an outburst in the back of the courtroom. I'm instructing you at this point that we have handled that situation and the folks that participated in that outburst are no longer allowed in the courtroom.

You're to disregard anything that you may or may not have heard or seen on your way out of the courtroom.

(Tr. 982-983.)

{¶ 19} This court has advised,

[w]hen an emotional outburst takes place in court, the issue is whether the outburst "deprived the defendant of a fair trial by improperly

influencing the jury." *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44. This "is a factual question to be resolved by the trial court, whose determination will not be overturned absent clear, affirmative evidence of error." *State v. White*, 85 Ohio St.3d 433, 709 N.E.2d 140 (1999), citing *State v. Morales*, 32 Ohio St.3d 252, 513 N.E.2d 267 (1987).

*State v. Roman*, 8th Dist. Cuyahoga No. 92743, 2010-Ohio-3593, ¶ 19.

{¶ 20} As far as the threats against Debardeleben's mother are concerned, we agree with the state that the record does not contain evidence sufficient to support a mistrial. In fact, there is no evidence in the record that the jury was aware of the threat.

{¶ 21} At the beginning of the afternoon session on February 8, 2019, outside of the presence of the jury, defense counsel stated:

> Your Honor, yesterday I know the court has already put on the record about the outburst that occurred in the back of the courtroom with threats to Tariq, but there has also been threats made on [Debardeleben's mother] who is seated in the back of the courtroom and has been here throughout the trial.
>
> Obviously, we were concerned for her safety and well-being, because throughout the last-year plus there had been threats. And Detective Curry is aware that those threats have been made since day one to the Debardeleben family.

(Tr. 1085.)

{¶ 22} Defense counsel further advised that he observed one of the ejected spectators waiting in the justice center as counsel was leaving the building with Debardeleben's mother at the end of the day. It appeared that the individual was waiting for the mother to leave. The trial court responded that it would issue "a

journal entry today" that required an escort for mother from and to her car. (Tr. 1088.)

{¶ 23} Debardeleben has not presented clear, affirmative evidence of error or substantiated that the trial court abused its discretion by denying the motion to dismiss due to the outburst. *Williams*, 8th Dist. Cuyahoga No. 106266, 2018-Ohio-3368, ¶ 35, 40.

### 2. Prosecutorial Misconduct

{¶ 24} Debardeleben offers that the state improperly solicited victim impact testimony, prejudicial opinion testimony by a police officer, and made a prejudicial "hired gun" comment about the defense expert.

{¶ 25} A prosecuting attorney's conduct constitutes error where the conduct deprives the defendant of a fair trial. *State v. York*, 8th Dist. Cuyahoga No. 87814, 2006-Ohio-6934, ¶ 23, citing *State v. Keenan*, 66 Ohio St.3d 402, 402-405, 613 N.E.2d 203 (1993); *State v. Gest*, 108 Ohio App.3d 248, 257, 670 N.E.2d 536 (8th Dist.1995). Since prosecutorial misconduct may violate a defendant's due process rights, "the touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *York* at ¶ 23, citing *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). We consider the impact of the misconduct "in light of the whole trial." *Id.*, citing *State v. Durr*, 58 Ohio St.3d 86, 94, 568 N.E.2d 674 (1991).

{¶ 26} "[P]rosecutorial misconduct constitutes reversible error only in rare instances." *State v. Eisermann*, 8th Dist. Cuyahoga No. 100967, 2015-Ohio-591,

¶ 44, citing *State v. Ball*, 8th Dist. Cuyahoga No. 99990, 2014-Ohio-1060, citing

*State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993).

> "'[A] defendant's substantial rights cannot be prejudiced where the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously.'"

*State v. Williams*, 8th Dist. Cuyahoga No. 95796, 2011-Ohio-5483, ¶ 67, quoting

*State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578, 957 N.E.2d 866, ¶ 30 (8th

Dist.), citing *State v. Williams*, 38 Ohio St.3d 346, 349-350, 528 N.E.2d 910 (1988).

### a.    Victim Impact

**{¶ 27}**  Basically,

> [v]ictim impact evidence is excluded because it is irrelevant and immaterial to the guilt or innocence of the accused — it principally serves to inflame the passion of the jury.  *See State v. White*, 15 Ohio St.2d 146, 239 N.E.2d 65 (1968).  Nevertheless, the State is not wholly precluded from eliciting testimony from victims that touches on the impact the crime had on the victims because "circumstances of the victims are relevant to the crime as a whole. The victims cannot be separated from the crime." *State v. Williams*, 99 Ohio St.3d 439, 2003 Ohio 4164, 793 N.E.2d 446 (2003).

*State v. Farmer*, 8th Dist. Cuyahoga No. 88675, 2007-Ohio-4046, ¶ 15.

**{¶ 28}**  Also,

> [v]ictim-impact evidence that relates only "to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family," *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), is generally inadmissible at the trial phase, but such evidence can be admissible if it also "relat[es] to the facts attendant to the offense," *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995).

*State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 259.

{¶ 29} Debardeleben argues that the state improperly solicited victim impact evidence from C. Dillard. C. Dillard resided with her sister, V. Dillard, M. Dillard's great grandmother, and was often involved with M. Dillard's care. C. Dillard assisted with M. Dillard's care earlier during the day and dropped her off at Debardeleben's apartment on the Friday in question. She described the events of the day as well as M. Dillard's health and demeanor. C. Dillard also recounted what transpired the next morning when she learned of M. Dillard's condition and joined the family at the hospital.

{¶ 30} The events recited by C. Dillard "'relate to the facts attendant to the offense.'" *McKelton* at ¶ 259, quoting *Fautenberry* at 440. Also, Debardeleben fails to demonstrate that a reasonable probability exists that the outcome of the trial would have been different but for the admission of the testimony. *State v. Freeman*, 8th Dist. Cuyahoga No. 92809, 2010-Ohio-3714, ¶ 45.

{¶ 31} We draw the same conclusion regarding the alleged comment by M. Dillard's grandmother, Howard, that Debardeleben presented a "sinister" image at M. Dillard's first birthday party. The word "sinister" was not employed. Howard commented that the Debardeleben wore all black attire to the party, did not remove his hoodie or hat during the party inside the house, and did not interact with M. Dillard or the other children. Howard's testimony related to Howard's knowledge, observations, and experience with M. Dillard, Beard, and Debardeleben.

### b.    Police Officer Impression

{¶ 32}    Debardeleben complains here of statements by Warrensville Heights Officer Sullivan[1] during a series of objections and argues that the statements were unfairly prejudicial under Evid.R. 403(A).   Officer Sullivan was asked why he decided to get his camera from the cruiser to record the scene after speaking with Debardeleben.

Court:    What is the basis of your objection?

Counsel:    I don't think we should be saying that his gut reactions are, what his eerie feelings are.   We've said he's been a patrolman, he's enforced the laws of Warrensville Heights, that he enforces traffic laws.  And all of a sudden he walks into a house — and nowhere in his report did he say he had an eerie feeling things were out of place there.

* * *

I think he can say the house — this was on the ground, that was over there, I saw water on the bathroom floor, there was feces in the tub.  He can say all those things. But I don't think he can give that opinion.

(Tr. 874-875.)

{¶ 33}    The trial court sustained the objection.  The trial court also sustained subsequent objections to the state's inquiries regarding what Officer Sullivan meant when he said, "something felt out of place" or "seemed suspicious" and whether it was normal for 19 and 20-year-olds "to take care of that many young children?"

---

[1] Debardeleben identifies Officer Schanz as the witness; however, the cited exchanges took place during the testimony of Officer Sullivan.

(Tr. 875-878). The witness did not respond to those questions, so no curative instruction was required.

{¶ 34} Officer Sullivan later verified and described the photographs that he took at the apartment prior to their submission into evidence. The trial court sustained the objections to the admission.

{¶ 35} The trial court also advised the jury at the inception of the trial that objections are made for legal reasons and that, if the trial court believes the objection is proper, the objection will be sustained. The jury was also advised that it should not draw any inferences from the ruling on objections and that it should not speculate what the answer might have been or the trial court's reason for sustaining the objection. We presume that the jury followed the trial court's instructions. *State v. Walker-Curry*, 8th Dist. Cuyahoga No. 106228, 2019-Ohio-147, ¶ 35.

{¶ 36} Debardeleben again fails to demonstrate that a reasonable probability exists that the outcome of the trial would have been different. *Freeman*, 8th Dist. Cuyahoga No. 92809, 2010-Ohio-3714, ¶ 45.

### c. Defense Expert Comment

{¶ 37} During its cross-examination of the defense expert, the state said "I just have a few more questions. I don't want to keep you from your next endeavor in Iowa. * * * Your next baby death case." (Tr. 1640.) The defense objected that the comments were sarcastic and so highly prejudicial it should cause a mistrial. The state responded that it had actual knowledge that the expert was going to testify in

Iowa. The trial court admonished that the comment was inappropriate and prejudicial but did not rise to the level of a mistrial.

{¶ 38} The trial court advised the jury to disregard the question and to strike it from the record. We presume that the jury followed the trial court's instructions. *Walker-Curry*, 8th Dist. Cuyahoga No. 106228, 2019-Ohio-147, ¶ 35. Debardeleben has not demonstrated that a reasonable probability exists that but for these statements the outcome of the trial would have been different. *Freeman*, 8th Dist. Cuyahoga No. 92809, 2010-Ohio-3714, ¶ 45.

### d. Undisclosed Statement

{¶ 39} Officer Sullivan testified that while speaking with Debardeleben at the apartment, Debardeleben said that he returned to the bathroom to find "the baby was under water in the tub." (Tr. 872.) That statement was not contained in the officer's report or in Debardeleben's written statement.

{¶ 40} Questioned extensively during cross-examination, Officer Sullivan admitted that the language was not in his report and that he did not mention to the state that it should have been in the report. Officer Sullivan did respond that he was sure that he told his partner on the scene.

{¶ 41} Debardeleben argues that he was irreparably harmed by the introduction of the evidence and cites the case of *State v. Montgomery*, 3 Ohio App.3d 280, 445 N.E.2d 254 (1st Dist.1982). In *Montgomery*, the trial court dismissed the case because the prosecution withheld the written statement of a co-defendant required to be disclosed under Crim.R. 16(B)(1). The question before the

appellate court was whether double jeopardy applied to a new trial. The court ruled that it did not. We do not find *Montgomery* to be instructive or determinative under the facts of this case.

{¶ 42} Officer Sullivan admitted during cross-examination that he recalled shortly prior to trial that Debardeleben made the statement that M. Dillard was under water. Therefore, the state could not have planned to improperly introduce evidence of which it had no knowledge. We also observe that the cause of death was due to blunt impacts to M. Dillard's head and abdomen, causing skull fractures and bleeding in the stomach area. There was no forensic evidence that indicated M. Dillard drowned.

{¶ 43} Officer Sullivan was thoroughly cross-examined about the statement. Debardeleben has not demonstrated that a reasonable probability exists that the outcome of the trial would have been different but for the statement. *Freeman*, 8th Dist. Cuyahoga No. 92809, 2010-Ohio-3714, ¶ 45.

## B. Sufficiency of the Evidence

{¶ 44} The question of whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). An appellate court does not weigh the evidence but determines "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 45} Debardeleben offers that there is no competent credible evidence that his acts caused the physical harm to M. Dillard resulting in her death.  Debardeleben was convicted of:

Count 1 —  the lesser included offense of reckless homicide, R.C. 2903.041;

Count 2 —  murder, R.C. 2903.02(B), causing the death of M. Dillard by committing or attempting to commit the crime of felonious assault;

Count 3 —  murder, R.C. 2903.02(B), causing the death of M. Dillard by committing or attempting to commit the crime of endangering children;

Count 4 —  felonious assault, R.C. 2903.11(A)(1);

Count 5 —  endangering children, R.C. 2919.22(B)(1);

Count 6 —  endangering children, R.C. 2919.22(B)(2); and

Count 7 —  endangering children, R.C. 2919.22(A).

All convictions merged.  Debardeleben was sentenced on Count 2.

{¶ 46} R.C. 2903.041, reckless homicide, provides that "[n]o person shall recklessly cause the death of another."

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences,

the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

R.C. 2901.22(C).

{¶ 47} Pursuant to R.C. 2903.02(B), known as felony murder:

No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

*Id.*

{¶ 48} R.C. 2903.11(A)(1), felonious assault, states that "[n]o person shall knowingly * * * cause serious physical harm to another."

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶ 49} R.C. 2919.22 governs endangering children:

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(1) Abuse the child;

(2) Torture or cruelly abuse the child * * *.

R.C. 2919.22(A), (B)(1)-(2).

{¶ 50} Debardeleben admits that he had custody, care, and control of M. Dillard and testimony by Beard, Romell, and Reginald confirm that fact. Debardeleben provides no explanation for what happened to M. Dillard during the bath and has not indicated that he encountered any problems while bathing her, though M. Dillard's family members testified that M. Dillard was afraid of water and disliked baths. *See, e.g.*, testimony by V. Dillard, "[i]f we took a bath I would have to be in the tub with her, because you couldn't leave her in the tub by herself because she feared water." (Tr. 654.)

{¶ 51} Debardeleben said that, as he was bathing M. Dillard, he heard the other children screaming and left the 15-month-old child alone in the tub while he went to check on them. Debardeleben returned to find M. Dillard sitting in the tub. While he was drying and dressing M. Dillard, she suddenly became limp and unresponsive.

{¶ 52} Debardeleben was unable to wake M. Dillard and attempted resuscitation efforts that were continued by Reginald when he and Romell were summoned by Debardeleben for assistance. Debardeleben provided the same description of events to Beard, Romell, Reginald, and the police.

{¶ 53} Reginald testified that M. Dillard's skin had a blue tone when he arrived in the bathroom. Reginald confirmed the photographic evidence that feces were in the bath water and on the side of the tub.

{¶ 54} The defense forensic pathologist opined that the injuries were caused by improper resuscitation techniques. The medical examiner rejected the explanation and stated the bruises would have been in the chest or rib area and not on M. Dillard's face. The medical evidence did not support drowning and the medical examiner testified that M. Dillard died from severe blunt force trauma injuries administered close to the time of death.

{¶ 55} We point out that

> [u]nlike direct evidence in which a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish, circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence.

*State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13.

{¶ 56} "Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37. The difference between circumstantial and direct evidence are irrelevant to the probative value as each carries the same weight. *Cassano* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 485, 2001-Ohio-4, 739 N.E.2d 749. "The Ohio Supreme Court has 'long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind

of the defendant's guilt beyond a reasonable doubt.'" *Id.*, citing *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990).

**{¶ 57}** Viewed in a light most favorable to the prosecution, we find that the evidence was sufficient to support the convictions in this case as a matter of law.[2] The assigned error lacks merit.

### C. Manifest Weight

**{¶ 58}** "A manifest weight inquiry looks at whether the evidence was substantial enough for a jury to reasonably conclude that all of the elements of the alleged crime have been proved beyond a reasonable doubt. We sit 'as a thirteenth juror.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); *State v. Newett*, 8th Dist. Cuyahoga No. 103518, 2016-Ohio-7605, ¶ 39.

**{¶ 59}** We

> examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).

*Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 81.

---

[2] We also note that the reckless homicide and murder verdicts are not inconsistent. A jury's determination that appellant "recklessly" caused the victim's death (reckless homicide) is not inconsistent with the finding that he committed a felony offense of violence (murder), as a proximate result of which he caused the victim's death. *State v. Day*, 8th Dist. Cuyahoga No. 83138, 2004-Ohio-1449, ¶ 50.

{¶ 60} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. The trier of fact is best able "'to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273 (1984).

{¶ 61} The evidence cited in our analysis of sufficiency also supports a determination that the verdict is not against the manifest weight of the evidence. We do not find this to be the "'exceptional case in which the evidence weighs heavily against conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

### D.    Cumulative Error

{¶ 62} Debardeleben claims that the cumulative effect of cited errors deprived him of a fair trial.

> The Ohio Supreme Court has recognized the doctrine of cumulative error. *See State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal. *Id.* at 196-197. *See also State v. Hunter*, 131 Ohio St. 3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132. Moreover, "errors cannot become prejudicial by sheer weight of numbers." *State v. Hill*, 75 Ohio St.3d at 212, 661 N.E.2d 1068.

*State v. Singleton*, 8th Dist. Cuyahoga No. 98301, 2013-Ohio-1440, ¶ 64.

**{¶ 63}** We have already determined that Debardeleben's arguments do not constitute error. "[W]here it is found that the trial court did not err, cumulative error is simply inapplicable." *Id.* at ¶ 66.

## IV. Conclusion

**{¶ 64}** The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

PATRICIA ANN BLACKMON, P.J., and
EILLEEN A. GALLAGHER, J., CONCUR